UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 03 CR 90 |
| v. | ) | Judge Ruben Castillo |
| | ) | |
| STEVEN SUSINKA | ) | |

## GOVERNMENT'S SENTENCING POSITION PAPER

The UNITED STATES OF AMERICA, by and through its attorney, PATRICK J.

FITZGERALD, United States Attorney for the Northern District of Illinois, respectfully submits

this sentencing position paper with respect to defendant STEVEN SUSINKA. The government

has previously submitted a government's version, which exhaustively set forth the facts and

circumstances of the offense, as well as defendant's role in the offense. This position paper is

submitted to supplement the government's anticipated argument at the upcoming sentencing.

I.   Each of the Factors Required to be Considered by the Court under 18 U.S.C. § 3553(a)
     Requires that Defendant Susinka be Sentenced at the Statutory Maximum of 20 Years'
     Imprisonment.

In imposing a sentence, the Court is required to consider the factors set forth in §

3553(a), including, among other things: (1) the nature and circumstances of the offense; (2) the

history and characteristics of the defendant; (3) the need for the sentence imposed (a) to reflect

the seriousness of the offense, to promote respect for the law, and to provide just punishment for

the offense, (b) to afford adequate deterrence to criminal conduct, and (c) to protect the public

from further crimes of the defendant; (4) the sentencing range set forth in the advisory

guidelines; and (5) the need to avoid unwarranted sentencing disparities among the defendants.

Each of these factors compels a statutory maximum sentence of 20 years' imprisonment for

defendant Susinka.

1.    Nature and circumstances of the offense

The nature and circumstances of the instant offenses could not weigh more heavily in favor of a statutory maximum sentence of 20 years' imprisonment for defendant Susinka.  As more fully set forth in the government's version of the offense and as proven at trial, the defendants, as members of the Insane Deuces street gang, committed 4 murders, 11 attempted murders, 2 conspiracies to commit murder, countless weapons offenses, and substantial drug trafficking in 2002 alone.  The murder and mayhem, however, was not confined just to 2002. Over the life of the conspiracy, which spanned from late 1994 to 2006, the defendants were responsible for countless murders, attempted murders, weapons offenses, and drug trafficking throughout northern Illinois, including in Chicago, Aurora, and Elgin.

Indeed, the defendants were members of a gang which had as its guiding principle the murder and destruction of rival gang members.  This guiding principle was perhaps best summarized by defendant Arturo Barbosa at the July 5, 2002 recorded gang meeting, when he stated: "no ifs, ands, or buts.  You see a flizzy, you do his ass, plain and simple."

The goal of the Insane Deuces was nothing short of taking control of Aurora, Illinois.  As defendant Salazar stated at the July 5, 2002 recorded gang meeting: "We could take this motha fucka town.  I'm tellin' you, we got close to 40 motha fuckin' kids, man.  They just don't know where to go."

If the gang's guiding principle of murder were not disturbing enough, the evidence further showed that, in attempting to take control of Aurora, the defendants were callously indifferent as to whether the individuals they killed and attempted to kill were actually rival gang members.  To the Insane Deuces, if you were young and Hispanic, or young and black, and the Insane Deuces did not know you, that was reason enough to kill you, because you were a threat

to their growth and plans for Aurora.  As defendant Salazar explained at the July 5, 2002 gang meeting: "For all these new niggas to grow up, that's, if one, if you King Killer, and you wanta be somethin', you gonna turn the motha fucka what? Duece.  Why you gonna give 'em the option?"  In explaining why a rival gang was a threat to the Insane Deuces, defendant Salazar further stated: "They're a threat because they're a threat to our growth, our growth, because all them neutron kids growin' up, they're givin' them another option to turn to somethin' else ... They should only have one choice ... Either if you gonna be that side ... you gonna be on this side, you ain't got but one choice.  Turn Deuce.  They stuntin' our growth."  To the Insane Deuces, the children of Aurora had only 1 choice to make growing up: turn Deuce or die.

The gang's reaction to their murder of David Lazcano on August 11, 2002, underscores the cold indifference of the Insane Deuces to human life.  As the Court will recall, David Lazcano was not a gang member.  Instead, David Lazcano belonged to the "Royal Individuals," which was a club dedicated to restoring low-rider cars and bicycles.  When the Royal Individuals finished restoring a car or bicycle, they would put a plaque on it with their motto – "Cruise Away from Crime."  The Royal Individuals would then take the restored cars and bicycles to shows, where they would talk to young people about the dangers of drugs and gangs.

Upon learning that David Lazcano was not a gang member, defendant Juarez explained to defendant Delatorre that they sometimes would kill non-gang members, indifferently stating, "Sometimes shit happens like that."  Defendant Delatorre perhaps summed up the indifference of the Insane Deuces best when he stated, "Fuck that stud.  He's guilty by association."

Of course, David Lazcano was guilty of nothing, other than being a 17-year-old boy trying to live his life and stay out of trouble.  Unfortunately, the Insane Deuces and these

defendants had no respect or use for individuals such as David Lazcano. In the end, David Lazcano was murdered because he was young and Hispanic and driving north on Union Street in Aurora, about to cross into "King hood." Because defendants Guzman and Delatorre did not recognize David Lazcano, they did what Deuces do, they assumed he was a rival gang member and murdered him in cold blood.

Although tragic standing alone the murder of David Lazcano is not the only example of a life ended much too early, or a life forever altered, by the defendants and their actions. Robert Perez was murdered inside his home, while playing video games with friends, the unintended victim of an attempt to kill a Latin King gang member. David Morales was gunned down by the Insane Deuces a little after 7 a.m. as he waited to for a ride to go look for a job. Erbell Valdez was just 15 years old when he was murdered while walking down the street on a Sunday afternoon. Fourteen-year-old Mario Gomez took the last steps he will ever take as he played with his brother and friends outside their family house; Mario was shot and is now paralyzed from the chest down because he was young, Hispanic, and not recognized by the Insane Deuces.

    2.    <u>History and characteristics of the defendant</u>

This factor also demands a statutory maximum sentence of 20 years' imprisonment. Defendant Susinka was an active Shorty member of the Insane Deuces, responsible for hooding out, selling drugs, performing "missions" against rival gang members, and "holding down" gang firearms. Defendant Susinka eagerly and repeatedly fulfilled each of those core responsibilities. Indeed, a short review of defendant Susinka's activities between October 2001 and April 2002, when he was arrested and has remained in custody since that date, illustrates his active and repeated involvement in the core business of the Insane Deuces.

First, in October 2001, defendant Susinka was arrested for violating the terms of his gang-specific probation, which prohibited him from wearing gang colors or gang insignia and from associating with other Insane Deuces gang members. Defendant Susinka was arrested because he was hanging out with two other known Insane Deuces gang members. When he was arrested, defendant Susinka was wearing black jeans with green stitching (the colors of the Insane Deuces), wearing a shirt with the number 2 (a symbol of the Insane Deuces) on the front and back, and was carrying Insane Deuces gang meeting sign-in sheet.

Second, in late November 2002, defendant Susinka was arrested after running with a gun away from the police, who had approached defendant Susinka, defendant Hernandez, and Insane Deuces gang member Rafael Vasquez near defendant Hernandez's house. Shortly after that arrest, defendant Susinka moved to California from December 1, 2001, to February 1, 2002. On cross-examination, defendant Susinka admitted that he moved to California after his mother negotiated a deal with the Kane County State's Attorney's Office to either move out of state or have his probation extended.

Third, within 11 days of returning from California, defendant Susinka drove defendants Delatorre and Crowder on the murder of Robert Perez on February 11, 2002. Among other things, on the night of the murder, defendant Susinka and other Insane Deuces gang members went out hunting for rival gang members to kill; they found and killed Robert Perez, who lived in the same trailer as a Latin King gang member. Although defendant Susinka was not the actual shooter, he was the driver throughout the night – before the murder when they were hunting for someone to kill, during the murder, when he dropped off Harold Crowder to kill Robert Perez,

and after the murder when he drove Harold Crowder and defendant Delatorre away from the scene of the murder.  In short, defendant Susinka's involvement was integral to the murder.

Fourth, the very next day, defendant Susinka was back with defendant Delatorre and Insane Deuces gang member Rafael Vasquez, stopped by the police after a brief chase, during which green and black (the Insane Deuces' colors) spray paint were tossed from the car.

Fifth, 11 days after the Robert Perez murder, defendant Susinka picked up other Insane Deuces gang members after the attempted murder of two suspected Latin Kings.  Once again, defendant Susinka was with defendant Delatorre, and they picked up the 14 year old shooter and two other juvenile Shorties.

Sixth, on March 13, 2002, defendant Susinka was arrested after he left defendant Hernandez's house with a gun, which was used 3 days earlier on the double attempted murder of two Latin King gang members.  At trial, defendant Susinka denied that he came from defendant Hernandez's house that night or that he had the gun on his person.  Unfortunately for defendant Susinka, the police were conducting surveillance on defendant Hernandez's house that evening because Bridget Susinka – defendant Susinka's sister – had informed the police that the gun used in that double attempted murder was inside defendant Hernandez's house.  Bridget Susinka knew the location of the gun because she picked up defendants Perez and Delatorre after they committed the double attempted murder on March 10, 2002, and then drove them to defendant Hernandez's house, where the gun was stored.

Seventh, on March 15, 2002, defendant Susinka was again with defendant Delatorre. This time, they were shot at by rival gang members.  Consistent with Insane Deuces gang rules,

neither defendant Susinka nor defendant Delatorre cooperated with the police investigation of this shooting, likely preferring to handle the investigation and response by themselves.

Eighth, on April 10, 2002, defendant Susinka was photographed at a Shorty gang meeting at defendant Hernandez's house.

Ninth, on April 11, 2002, defendant Susinka sold cocaine to an undercover officer.

Tenth, on April 15, 2002, defendant Susinka sold cocaine to an undercover officer.

Eleventh, on April 16, 2002, defendant Susinka was arrested after fighting with the police, during which a gun dropped to the ground from defendant Susinka's pants.

By any measure, defendant Susinka's crime spree in the 4.5 months he was in Aurora, Illinois, between October 2001 and April 16, 2002, is startling. Through his actions, he repeatedly demonstrated that he has no respect for human life or the laws that govern normal society. Defendant Susinka's contempt for the law and the legal system continues to this day, as he steadfastly denies ever having been an Insane Deuces gang member, let alone involved in the specific criminal activities outlined above. Defendant Susinka's approach to this case appears to be to deny knowledge of any criminal activity, to deny any knowledge of the Insane Deuces, to deny knowing that anyone – even defendant Delatorre, defendant Hernandez, and his own sister – were Insane Deuces gang members, and blame all his problems on overreaching police officers. Unfortunately for defendant Susinka, however, there is no one to blame but himself for his prolific criminal conduct. He must now answer for his actions, and the only appropriate response is to sentence defendant Susinka to as much time as legally permissible.

3.      The need for the sentence imposed (a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (b) to afford adequate deterrence to criminal conduct, and (c) to protect the public from further crimes of the defendant.

These factors also require a statutory maximum sentence. As detailed above and throughout the government's filings in this case, there are few, if any, more serious offenses than this one, which involved organized and systematic killings. In committing these crimes, the defendants have repeatedly demonstrated that they have no respect for the law or human life. Defendant Susinka's specific involvement in at least 1 murder and 1 attempted murder alone warrant the statutory maximum penalty.

With respect to deterrence, a statutory maximum sentence is necessary to deter future criminal conduct by this defendant. As noted above, defendant Susinka was an integral part of the Insane Deuces, responsible for at least 1 murder, 1 attempted murder, drug trafficking, and multiple gun offenses. Not surprisingly, defendant Susinka's acumen as a gang member was not unnoticed by the gang's leaders. Indeed, his activities during that time period show that he was a trusted lieutenant of defendant Delatorre, the leader of the Shorties, and defendant Hernandez and Rafael Vasquez, the Juniors in charge of overseeing the Shorties.

A term of years is not going to deter this defendant or any member of the Insane Deuces. Indeed, serving time in prison is a badge of honor in the Insane Deuces, earning a member respect for the "time" he does on behalf of the organization. As the evidence in this case further proved, when a member is released from prison, he expects to receive the respect he has perversely earned within this organization.

A life sentence will also act as general deterrence, sending a message to the young people throughout this judicial district that, if you join a gang, where murder, gun trafficking, and drug

8

dealing are part of the agreement, you forfeit your right to live in a free society as soon as you are caught. You forfeit that right not for a few years, but for as long as the law permits – in the case of defendant Susinka, 20 years's imprisonment.

Most importantly, a statutory maximum sentence is necessary to protect the public from further crimes of the defendant. Simply put, every day that defendant Susinka spends in jail, the children of Aurora will be safer on their streets, on their bikes, playing outside, and in their schools.

4.      The Sentencing Guidelines

The Sentencing Guidelines also weigh heavily in favor of a statutory maximum sentence. As detailed in the presentence report, the Guideline range for defendant Susinka is life imprisonment. In fact, the adjusted base offense level for defendant Susinka was 45, which is 2 levels beyond the end of the sentencing guideline grid. Given that guideline range, and the criminal conduct underlying it, the maximum possible sentence available to the Court is appropriate.

5.      Defendant Susinka's Sentence Should be Imposed Consecutive to his Undishcharged State Prison Sentence.

Guideline § 5G1.3 governs the imposition of a sentence on a defendant subject to an undischarged term of imprisonment. Section 5G1.3 contains three subsections, which provide:

(a)      If the instant offense was committed while the defendant was serving a term of imprisonment (including work release, furlough, or escape status) or after sentencing for, but before commencing service of, such term of imprisonment, the sentence for the instant offense shall be imposed to run consecutively to the undischarged term of imprisonment.

(b)      If subsection (a) does not apply, and a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of § 1B1.3 (Relevant

Conduct) and that was the basis for an increase in the offense level for the instant offense under Chapter Two (Offense Conduct) or Chapter Three (Adjustments), the sentence for the instant offense shall be imposed as follows:

> (1) the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons; and

> (2) the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment.

(c) (Policy Statement) In any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.

Subsection (a) is applicable and requires a consecutive sentence. For purposes of subsection (a), the "instant offense" is the RICO conspiracy, which lasted from late 1994 until May 2006. The undischarged term of imprisonment is the 9 year sentence imposed on December 13, 2002, by the Circuit Court of Kane County, Illinois.[1] Accordingly, the RICO conspiracy continued, and thus part of the instant offense was committed, after defendant Susinka was sentenced in Kane County. *See United States v. Hill*, 42 F.3d 914 (5th Cir. 1995) (holding that

---

[1] Defendant Susinka continues to serve that state sentence while in federal custody because he is present before the Court on a writ of *habeas corpus ad prosequendum. See Sinito v. Kindt*, 954 F.2d 467, 469 (7th Cir.1992) (writ of *habeas corpus ad prosequendum* does not alter custody status); *Binford v. United States*, 436 F.3d 1252, 1254-56 (10th Cir.2006) (explaining that federal sentence commenced only when petitioner had completed his state sentence and "was finally received into federal custody for the purpose of serving his federal sentence"; federal sentence had not commenced when, after conclusion of federal prosecution, petitioner spent several weeks in BOP facility due to mistake of marshals service in delivering him there instead of returning him to state on expired writ of *habeas corpus ad prosequendum*); 18 U.S.C. § 3585 ("A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention ... that had not been credited against another sentence.").]

10

the conspiracy of which defendant was convicted continued, and, thus, part of the instant offense was "committed," after defendant was sentenced by another court for another crime, so that, consecutive sentence was required under § 5G1.3(a)).

Although defendant Susinka has been in custody since that time, his involvement in the conspiracy did not end with his arrest and incarceration because there is no evidence of his withdrawal from the conspiracy. *See United States v. Wilson*, 134 F.3d 855, 863 (7th Cir.1998) (holding that to withdraw from a conspiracy, a defendant must "terminate completely his active involvement in the conspiracy, as well as take affirmative steps to defeat or disavow the conspiracy's purpose"); *United States v. Williams*, 81 F.3d 1434, 1442 (7th Cir.1996). To the contrary, as the evidence at trial proved, the charged conspiracy existed both in and outside of prison, with Insane Deuce gang members enjoying substantial benefits from the gang while in prison, most notably the protection of other Insane Deuces gang members and other Folk gangs.[2]

---

[2] Subsection (b) is not applicable because defendant Susinka's state conviction was not a "basis for an increase in the offense level for the instant offense under Chapter Two or Chapter Three. *See* Guideline § 2E1.1, Application Note 4 ("Certain conduct may be charged in the count of conviction as part of a "pattern of racketeering activity" even though the defendant has previously been sentenced for that conduct. Where such previously imposed sentence resulted from a conviction prior to the last overt act of the instant offense, treat as a prior sentenced under § 4A1.2(a)(1) and not as part of the instant offense.").

Subsection (c) is not applicable because Subsection (a) is. However, if the Court were to conclude that neither Subsection (a) nor Subsection (b) were applicable, the Court would have broad discretion to choose whether to impose a sentence concurrently or consecutively to defendant Susinka's undischarged state sentence. *See* 18 U.S.C. § 3584; U.S.S.G. § 5G1.3(c). In exercising that discretion, the Court would consider the factors set forth in 18 U.S.C. § 3553(a), such as the nature of the offense, the history and characteristics of the defendant, and the need to punish and deter criminal activity. *See* 18 U.S.C. §§ 3553(a), 3584; *see also United States v. Tockes*, No. 07-3294, 2008 WL 2550733, at *3-4 (7th Cir. June 27, 2008). The government's analysis of those factors is set forth above; each factor strongly favors a consecutive sentence. As noted above, defendant Susinka's guideline range is life imprisonment based, in part, on his personal participation in at least 1 murder and 1 attempted murder. Under those circumstances, a

Given defendant Susinka's wide-ranging participation in the RICO conspiracy, including his personal participation in at least 1 murder and 1 attempted murder, imposing a 20-year statutory maximum sentence consecutive to the 9-year prison sentence he is currently serving in the state system is an appropriate result. Once sentence in this Court, defendant Susinka will be returned to state custody, where he will almost certainly be released immediately back to federal custody. That will result in an effective sentence of less than 27 years' imprisonment, a small price for defendant Susinka to pay for the lives he has ruined.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney


   /s/ Patrick C. Pope
Patrick C. Pope
Christopher P. Hotaling
Meghan C. Morrissey
Assistant United States Attorneys
312-353-1980

---

consecutive sentence of 20 years' imprisonment is appropriate.

12

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that the following documents:

## GOVERNMENT'S SENTENCING POSITION PAPER

was served on December 15, 2008, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

        /s/ Patrick Pope
Patrick Pope
Assistant United States Attorney
(312) 353-1980

13