```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )
                                      )
 4                  Plaintiff,        )  Case No. 03 CR 90-16
                                      )
     -vs-                             )
 5                                    )  Chicago, Illinois
     STEPHEN SUSINKA,                 )  January 20, 2009
 6                                    )  1:13 p.m.
                    Defendant.        )
 7

 8                  TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE RUBEN CASTILLO
 9
     APPEARANCES:
10
     For the Government:        HON. PATRICK J. FITZGERALD
11                              UNITED STATES ATTORNEY
                                BY:  PATRICK POPE
12                                   MR. CHRISTOPHER HOTALING
                                     MS. MEGHAN MORRISSEY
13                              219 S. Dearborn Street
                                Chicago, IL  60604
14                              (312) 353-5300

15   For the Defendant:        MR. JACK P. RIMLAND
                                820 West Jackson Boulevard
16                              Suite 300
                                Chicago, Illinois  60607
17                              (312) 879-1785

18                              MR. STEVEN M. WAGNER
                                820 West Jackson Boulevard
19                              Suite 300
                                Chicago, Illinois  60607
20                              (312) 879-1785

21   Court Reporter:

22             KATHLEEN M. FENNELL, CSR, RMR, FCRR
                     Official Court Reporter
23               United States District Court
            219 South Dearborn Street, Suite 2144-A
24                  Chicago, Illinois  60604
                  Telephone:  (312) 435-5569
25        email:  Kathleen_Fennell@ilnd.uscourts.gov
```

1    (Proceedings heard in open court:)

2         THE CLERK:  03 CR 90, United States versus Stephen

3    Susinka.

4         MR. POPE:  Good afternoon, your Honor.  Patrick Pope,

5    Chris Hotaling and Meghan Morrissey on behalf of the United

6    States.

7         MR. WAGNER:  Good afternoon, your Honor.  Steven

8    Wagner and Jack Rimland on behalf of Stephen Susinka who's

9    present before the Court.

10        PROBATION OFFICER:  Good afternoon, your Honor.

11   Christina Figueroa on behalf of Probation.

12        THE COURT:  Thanks for being here.  And Ms. Figueroa,

13   you can be seated.

14        Are both sides ready to proceed to sentencing?

15        MR. POPE:  Yes, your Honor.

16        MR. WAGNER:  Yes, Judge.

17        THE COURT:  And have you had, Mr. Wagner, a full

18   opportunity to review the Presentence Investigation Report?

19        MR. WAGNER:  I have had an opportunity on my own,

20   your Honor; and, if the next question is have I had an

21   opportunity to go over it with Mr. Susinka, I have done that

22   as well.

23        THE COURT:  Okay.  Are there any changes you wish to

24   make to the report?

25        MR. WAGNER:  With regards to any of the educational

1    or background information, no, Judge.

2         THE COURT:  Okay.  Any on behalf of the government?

3         MR. POPE:  None, your Honor.

4         THE COURT:  And are there any other factual

5    objections you have in the report?

6         MR. WAGNER:  Just one second, Judge.

7         THE COURT:  Go ahead.

8      (Counsel and defendant conferring.)

9         MR. WAGNER:  Your Honor, certainly with the Court's

10   indulgence and consideration for having allowed Mr. Susinka,

11   as well as a number of other defendants throughout the course

12   of this case for the years that we've been before the Court

13   specifically with regards to my client, Mr. Susinka, to have

14   allowed him to address the Court both verbally in court and

15   also with regards to written motions, which he's filed.

16        As the Court may, in fact, be aware, Mr. Susinka had

17   filed on his own behalf approximately an 87-page memorandum in

18   which --

19        THE COURT:  I did receive it.

20        MR. WAGNER:  -- he does take exception with some of

21   the factual points raised in the PSR.  So, again, with the

22   Court's indulgence and your Honor's permission, Mr. Susinka

23   had asked me for the opportunity to ask you to allow him to

24   address those issues.

25        THE COURT:  Okay.  Mr. Susinka, you can proceed.

1      DEFENDANT SUSINKA:  Yes, your Honor.  Thank you.

2      MR. POPE:  May I sit so I can take notes?

3      THE COURT:  Yes, you may.

4      DEFENDANT SUSINKA:  Just to be courteous of the

5  Court's time, I'm going to try to skip over some of the issues

6  I raised in my memorandum and bring up issues that I didn't

7  raise in my memorandum --

8      THE COURT:  Okay.

9      DEFENDANT SUSINKA:  -- but I may repeat some of the

10  issues in my memorandum that I think are the most important.

11      THE COURT:  Okay.

12      DEFENDANT SUSINKA:  But the first of my issues was

13  the base offense level on the racketeering guideline, and the

14  PSR calculation of my guideline under 2E1, that's the

15  underlying racketeering activity, but as an alternative to the

16  arguments that I raised in my sentencing memorandum, adding an

17  alternative argument that there is no underlying racketeering

18  activity because the focus of the racketeering conspiracy is

19  the agreement itself, not the racketeering activity.  So I'm

20  saying that underlying racketeering activity doesn't apply.

21      Or else, in the alternative, that if the Court

22  chooses to apply the relevant conduct instead of the

23  underlying racketeering activity guidelines, then as raised in

24  my memorandum the Sixth Amendment applies to -- or

25  excuse me -- I mean the language of the relevant conduct

1  guideline that any -- any crime that is an element of the

2  offense, that is not an element of the offense cannot be taken

3  into account in adding up the base offense level.

4        So what I'm saying is that the murder on Robert Perez

5  and the narcotics conspiracy -- and the narcotics conspiracy

6  are issues that effectively raised my statutory maximum,

7  which, under the case law I've submitted in my memorandum, the

8  Court is barred from taking into consideration because of that

9  fact.

10        THE COURT:  So if I accepted your position, the

11  maximum is what?

12        DEFENDANT SUSINKA:  20 years.

13        THE COURT:  Uh-huh.

14        DEFENDANT SUSINKA:  But my position is that -- well,

15  okay.

16        MR. POPE:  Your Honor, there's no dispute regarding

17  that issue.

18        THE COURT:  Right.

19        MR. POPE:  Based on the jury's finding, the maximum

20  sentence that he can be subject to is 20 years, putting aside

21  the concurrent/consecutive issue.

22        DEFENDANT SUSINKA:  But my issue is more with that,

23  what is and isn't allowed to be considered by the Court as the

24  Supreme Court has set forth, and I'll repeat the issue as I

25  raised in my memorandum about the *Jones* case, how the *Jones*

1  case is similar to my racketeering case and the likely

2  sentencing statute on the racketeering holds that my maximum

3  is 20 and can be increased to life, depending on the

4  racketeering activity.

5  So that's why the *Apprendi* issue was raised, and the

6  jury was sent to a second round of deliberations to deliberate

7  with those statutory aggravating factors. So I'm raising a

8  similar argument about that.

9  About the murder, I got the double jeopardy argument.

10  That depends on my 6th Amendment if you find that the Robert

11  Perez and the narcotics conspiracy are in fact elements and

12  you agree with my 6th Amendment argument, then double jeopardy

13  applies according to my theories.

14  Then my third argument regarding the Robert Perez

15  incident was that I was not part of the conspiracy, at least

16  on the day that the Robert Perez murder occurred, and that is

17  based on I cited case laws in my memorandum. I got the

18  *Valencia* case from the 5th Circuit. It was ruled on

19  November 2, 2006.

20  Then I got the -- and, well, the *Valencia* case had to

21  do with being part of a conspiracy subsequent to your 18th

22  birthday. That case stated that in order -- anything that was

23  pre your 18th birthday was not to be considered as part of the

24  conspiracy and you had to reratify your involvement with the

25  conspiracy subsequent to your 18th birthday.

1      And past that, because my assertion is that I wasn't
2  part of the conspiracy subsequent to my 18th birthday at least
3  on the date or the time that the Robert Perez murder happened,
4  and there was no evidence showing any association with anybody
5  before the Robert Perez murder subsequent to my 18th birthday,
6  that it cannot be calculated as relevant conduct.

7      And I believe the relevant conduct guidelines, if you
8  choose to apply the relevant conduct, it states in a footnote,
9  I'm not sure because I have no access to legal material
10 regarding the guidelines, so I'm pretty sure it says that you
11 cannot be foreseeable to an act that was committed before you
12 were a member of the conspiracy.

13     And I cited the *Westview* case in support of that.
14 That was an 11th Circuit case decided April 16, 2008 that said
15 that you cannot be held liable for acts that were committed
16 before you were part of the conspiracy.

17     And my last point of that argument is the
18 government's acquittal against me -- I mean for me on the
19 Robert Perez incident shows that I was not a part of the
20 conspiracy after my 18th birthday, at least at the time that
21 the Perez homicide was committed because that would have been
22 my first predicate act and the first piece of evidence towards
23 my agreement after my 18th birthday, and the jury explicitly
24 rejected that.

25     So that's my fourth argument, again going toward the

1    Robert Perez, is the 3553(a) factors.  I got 3553(a)(6) about
2    the sentencing disparities and the explicit language in
3    3553(a)(6) states that it's to avoid unwarranted sentencing
4    disparities between defendants who have been found guilty of
5    the same conduct with similar backgrounds.

6         But, I mean, that's not an exact quote, but I know
7    for sure the "found guilty" language is explicitly reflected
8    in the 3553(a)(6), and that's what I'm focusing on is what
9    I've been found guilty.  So I'm saying that today in
10   considering my sentencing that you will consider facts that I
11   have been found guilty of based on the statute 3553(a).

12        And going more towards the acquitted column, shifting
13   from the factual issues to, like, the acquitted conduct issue
14   about the *Watts* case.  The *Watts* discusses the acquitted
15   conduct, but the *Watts* in my opinion the way I understand the
16   case, it seems to carve out an exception towards special
17   findings of the jury because that case they said that unless
18   there are special findings of a jury, there's no way to
19   basically to know exactly, like, what a jury rejected and did
20   not reject.  And in this case, there were special findings,
21   and the jury explicitly rejected that I was responsible for
22   the homicide of Robert Perez.

23        Again, it's not a general verdict, that the *Watts*
24   case addresses that just because there was a general verdict
25   of not guilty, that means that -- excuse me -- that means that

1   it only shows that the jury failed to find one of the elements
2   of the crime proven beyond a reasonable doubt, but in this
3   case, that's not the case because these were special findings
4   in a general not guilty verdict.

5           And the third point regarding the *Watts* case is that
6   they held that it was appropriate to increase one's sentence
7   because they say that the crime was committed in a manner that
8   warrants increased punishment.

9           Again, that was the whole point of the second round
10  of deliberations, and the jury found that my racketeering
11  violation was not committed in a manner that warrants
12  increased punishment because my increased punishment would
13  rise to a life sentence instead of 20 years.

14          Another point going along with the acquitted conduct,
15  there's a new case that just came out on Christmas Eve in 2008
16  from the 6th Circuit named *White*.  In that case, they
17  explicitly state that even though a court is allowed to
18  consider acquitted conduct, that the 6th Amendment is a
19  backstop.  I think that substantiates my 6th Amendment
20  argument.

21          And the case goes on to quote *Apprendi* for the
22  proposition that any fact that increases my statutory maximum
23  must be proved beyond a reasonable doubt.

24          My other point related to my acquitted conduct is the
25  *Rita* case, and in *Rita*, there was a concurring opinion I

1    think -- I'm not sure how to say his name, Scalia.  He

2    concurred and held that there could be a 6th Amendment

3    violation and a sentence if it could only be upheld as

4    reasonable based on the judicial fact finding.

5           So today if you make a judicial fact finding that I'm

6    legally liable for the Perez incident, then on appeal the only

7    reason my sentence would be upheld as reasonable would be

8    because of your judicial fact finding today.

9           And then my last argument regarded the acquitted

10   conduct issue is the *Hurn* case, which notes the standard of

11   proof regarding acquitted conduct that substantially increases

12   the guidelines on my case, so as currently standing, I'm at a

13   level 19 without any relevant conduct findings and underlying

14   racketeering findings; but if you make the finding that I was

15   involved with the Perez incident or legally liable for it,

16   then that would raise my guidelines to a level 43.  That's

17   what I'm saying, that's a lot of time.

18          So the standard of proof in *Hurn* was like those type

19   of increases in the sentence standard of proof, there may be a

20   due process issue by making that finding by a preponderance of

21   the evidence and instead it would be more appropriate to be

22   found by clear and convincing evidence.  But that's the

23   relevant 7th Circuit case law.  I'm still asserting that it

24   needs to be proved beyond a reasonable doubt because it

25   enhances my statutory maximum.

1    I've addressed my factual issues.  My next issue is

2  about the admission of Fernando Delatorre's testimony in

3  today's proceedings.  I'm saying that it should not be

4  admitted.  I'm entitled to rebuttal.  He's not here to

5  testify.  I'm saying under *Crawford*, I'm allowed to

6  cross-examine him because anything used in his testimony would

7  be going toward the fact of the issues asserted, which would

8  be the Perez and the narcotics issues.

9    Then in my memorandum, I cited *McMillan*, I mean

10  *McMillan versus Pennsylvania* where they recognize a case

11  called *Specht versus Patterson* where they said any sentencing

12  proceedings that are conducted while I'm not allowed to

13  cross-examine my accusers violates due process.

14    So according to these Supreme Court cases, Fernando

15  Delatorre's proffer or his grand jury testimony isn't

16  admissible in this proceeding because I'm not allowed to

17  cross-examine him.

18    Other than that, his testimony is unreliable because

19  I had no cross.  He tried a statement and I have a signed

20  affidavit.  I don't know if that's been submitted to you, but

21  I have an affidavit from 2006 that he wrote.  He signed it.

22  It's been notarized.  He took an oath that basically he lied,

23  so I'm saying that, because of these facts, that his testimony

24  is not to be considered today.

25    I have an issue -- I'm trying to streamline, excuse

1    me.

2            THE COURT:  Uh-huh.

3            DEFENDANT SUSINKA:  I got the February 23rd incident.

4    I didn't address this one in my memorandum because I assumed

5    counsel was going to address it, but the PSR claims that it's

6    not relevant conduct, but in case you choose to disregard the

7    PSR in this instance, I feel like I need to address that.

8            I got the same 6th Amendment argument.  Attempted

9    murder in Illinois carries a statutory maximum of 30 years, so

10   I think that raises my statutory maximum.  It's a Class X

11   felony, 30 years, then there are several enhancements that are

12   applied on the sentencing regarding attempted murder.

13           They got a what's called a 15/20/25 statute where

14   it's 15 years if you possessed a gun during the commission of

15   attempted murder, and it's 20 years added to your sentence if

16   you personally discharged a firearm during the commission of

17   the crime.

18           Even though I didn't personally possess the weapon

19   and I didn't personally discharge the weapon, I guess I could

20   still be held legally liable, so that's why I'm raising it.

21   I'm still saying under the 6th Amendment it raises my statutory

22   maximum.

23           I'm not sure if it applies under the racketeering

24   sentencing statute 1963 because it goes from 20 years to life,

25   so I'm not sure if any increase in my maximum is applicable.

1   So if this is found, would it raise my maximum to 30 years,
2   can they do that under racketeering statute?  I'm not sure.
3   But my second issue regarding the 2-23 incident would be
4   Delatorre's testimony.  As I said before, it's not admissible.

5           Third, my third point regarding it is more factual.
6   I'm saying that it's not proven by a preponderance of the
7   evidence because I'm assuming that's going to be the standard
8   here.  Lorenzo Becerra, when he first made his initial
9   statement the night he was arrested, he didn't mention me, and
10  he never picked me out of a lineup.  He picked everybody else
11  out, talked about everybody else, wrote about everybody else.
12  He admitted that he lied.  He claimed that somebody else did
13  the shooting, then turned around and changed his story and
14  claimed that he was the one that did the shooting.  So his
15  stories are pretty much all over the place.

16          Then in terms that it doesn't fit into attempted
17  murder because there was no intent, instead he pled guilty to
18  aggravated discharge.  And I know from my own experience in
19  the state when you allocute you say that you're guilty of the
20  crime, are you pleading guilty because you're actually guilty
21  of the crime?  He pled guilty to aggravated discharge, that's
22  shooting the weapon without any intent, so I'm saying there's
23  no intent to be found.

24          His own trial testimony claims that he was coerced,
25  so I understand that that's a mitigating circumstance.  So say

1    if he would have, in fact, committed a murder that day, it

2    wouldn't have been first-degree murder.  He would have had a

3    chance to catch a second-degree murder because the aggravating

4    circumstance that he felt like he was in danger because he was

5    supposedly threatened with violations or whatever, so there

6    was no intent.  Claiming that he was coerced, that's a

7    mitigating circumstance dropping it down not from a -- from an

8    attempted murder to I guess it would be attempted

9    manslaughter.

10            Then also according to his testimony, I took him

11   home, like, between he said they were planning it.  Then he

12   claims I showed up.  My side is different, but he claims I

13   showed up in the middle of it, and that I drove him to his

14   house and he got out of the truck at his house and, according

15   to him, he went in the house and ate.

16            So at that point in time, there was no -- no

17   liability for me, no liability could have attached to me

18   because I didn't take him to do anything.  It wasn't my job to

19   take him to do anything.  Nobody told me to do anything, and

20   he claimed during the planning of the incident I wasn't

21   present.  There was no proof that I knew what was going on.

22   He said that I was outside of the house.  He claimed the

23   planning was going on inside the house.

24            He claimed that he was supposed to call Delatorre,

25   not me, for a ride, so there's -- if he's supposed to call

1  Delatorre but I'm supposed to be driving, why would he be
2  calling Delatorre when he's supposed to be calling me because
3  I be the one to come pick him up according to him.

4          Now, related to this, I got my own testimony.  My
5  testimony was that I was not around during the time this
6  incident was being planned.  I pretty much ran across these
7  guys by happenstance and I got myself caught up in the mix.

8          I'm claiming that it doesn't amount to an attempted
9  murder because of that because he claims he was coerced and
10 that even if you do find that it does amount to attempted
11 murder, the evidence doesn't show at least by a preponderance
12 of the evidence.

13         My fourth issue related to the attempted murder is
14 concerning the guidelines.  The attempted murder, as the
15 government characterizes it, was committed on February 23rd,
16 2002.  Now, according to my research in 2004, the attempted
17 murder guideline 2A1.2, I believe, was amended by amendment
18 663 and was raised from a level 28 to a level 33.  So even if
19 you make a finding by a preponderance of the evidence that the
20 attempted murder is applicable to me, that my offense level
21 should be a 28 under that finding because it would violate ex
22 post facto principles because at the time of the commission of
23 the crime, the offense level was 28.

24         Second, regarding the ex post facto would have been
25 my withdrawal from the conspiracy upon my incarceration.  In

1   2005 the 7th Circuit ruled on the *United States versus*
2   *Paladino*, it focused more on the *Booker* ruling and the limited
3   remand for sentencing, but they also raised some of the
4   factual issues raised by the defendants in that case.  And in
5   *Paladino*, they recognized a 2nd Circuit case, *United States*
6   *versus Borelli*, from back in 1962, which I used in my
7   objection to the *Santiago* proffer and in our motion for
8   severance that claims that once a conspirator is incarcerated
9   for a crime that could be considered relevant conduct, that
10  that counts as a withdrawal from the conspiracy.

11          So the 7th Circuit recognized that case in 2005, and
12  so I'm saying that that case could apply and applies to my
13  withdrawal from the conspiracy before the guideline was
14  changed.

15          And then my last issue concerning the 2-23 incident
16  would be even if there is a finding that there was an
17  attempted murder at that day, that I qualify for a six-point
18  reduction for only being an accessory after the fact.  So that
19  would drive my offense level from level 28 to a level 22
20  because there was no proof.  I didn't take him to the
21  shooting.  I didn't help him get away from the shooting.  I
22  didn't point anybody out.  I didn't provide him with the
23  weapon.  I had no direct involvement with the shooting
24  whatsoever.  He got away on his own, got there on his own.  He
25  bumped into me, so I picked him up; but I believe that if

1   there is a finding that I was involved, that I only qualify as
2   being involved as an accessory after the fact.

3           I'll move on to my reductions in my offense level.
4   Counsel raises the issue that my sentence should be ran
5   concurrent all the way from 2002 under United States guideline
6   5G1.3(b).

7           THE COURT:  When does your state sentence end,
8   Mr. Susinka?

9           DEFENDANT SUSINKA:  I'm not sure.  My state sentence
10  was up in April 5th, 2006.  That was my MSR date or my
11  Mandatory Supervised Release date, but now they're still
12  holding me in custody, so I'm not sure exactly when, if
13  they're going to max me out on my whole nine years or make me
14  serve the rest of my parole time, which will be up in two
15  months.  I'm not sure.

16          But they argue under 5G1.3(b), so I'm saying in the
17  alternative, if you reject the 5G1.3(b) argument, I'm saying
18  that under 5G1.3(c), which holds that I'm liable to -- or it
19  says that you can run my sentence concurrent from the date
20  that you choose and if you don't choose to run my sentence
21  concurrent at least from the beginning, then in the
22  alternative at least run it concurrent from the day I was
23  brought into federal custody, which is October 14, 2005.

24          And I mean the footnote states, it's note 3(b), I got
25  it quoted right here.  It says, "The court may provide a

1   judgment in the criminal case order that the sentence for the

2   instant offense shall commence on a specified date."  So you

3   could choose whatever date to start running my sentence if you

4   choose to run it concurrent either from the beginning of April

5   or from October 14th, 2005, when I was brought into federal

6   custody through a writ.

7         My second part to my reductions is another 5G1.3(c)

8   argument, and then footnote (e) -- I mean footnote 3(e) is

9   downward departure provision.  Even though my understanding of

10  the law is not saying that downward departures would be

11  considered obsolete, but that's just the language of the

12  guidelines.  They call it a departure, so that's what I'm

13  going to use here.

14        I was thinking that if 5G1.3(c) doesn't apply, I mean

15  5G1.3(b) doesn't apply, I think 5G1.3(c) should be applied in

16  a 5G1.3(b) manner because the drug conspiracy could be

17  considered relevant conduct, but it doesn't enhance my offense

18  level.  But even though -- but because it doesn't enhance my

19  offense level, 5G1.3(b) may not be applicable.  So if

20  5G1.3(b), if you choose not to apply it, in the alternative,

21  I'm requesting a departure under 5G1.3(c) note 3(e), the

22  departure provision for the 81 months I spent in state

23  custody.

24        So it would be because under 5G1.3(b) it says that

25  you should adjust the sentence to account for the time, but

1  since I don't know if I directly fall under 5G1.3(b), the

2  departure under 5G1.3(c), I'm requesting --

3          THE COURT:  You were taken into custody on April 14,

4  '05, that's for sure.

5          DEFENDANT SUSINKA:  No, October.  October 14th, 2005.

6          THE COURT:  October 14th.

7          DEFENDANT SUSINKA:  Yes.

8          THE COURT:  Okay.

9          DEFENDANT SUSINKA:  Just it should be --

10         THE COURT:  Let me just ask you a couple of things.

11         DEFENDANT SUSINKA:  Yes.

12         THE COURT:  First of all, there's no acquitted

13  conduct in your case, right?  You were not found not guilty of

14  anything.

15         DEFENDANT SUSINKA:  Correct, but I believe that the

16  special findings of the jury that I was not involved with the

17  Robert Perez incident may qualify as acquitted conduct.  I'm

18  not sure.  I'm making the argument.

19         THE COURT:  That's just your reading of that finding.

20         DEFENDANT SUSINKA:  Right.  That's my understanding

21  just in case.

22         THE COURT:  You understand that once you were

23  convicted beyond a reasonable doubt of RICO, that alone drove

24  your guidelines into the range of 40 -- what is it, 45.  You

25  understand that in terms of your sentencing guidelines which

1   are advisory in nature?

2          DEFENDANT SUSINKA:  I understand that they are

3   advisory, but my understanding of it was that it did not, only

4   upon a judicial fact finding that it drove my offense level up

5   to a level 43.  That's my understanding.

6          THE COURT:  Okay.  Well, I would just tell you in

7   response to what you've outlined, given your conviction of

8   RICO, which I know was a hard-fought conviction but

9   nevertheless is a conviction that the jury made beyond a

10  reasonable doubt, I will use the guideline calculations made

11  in the presentence report which indicate that the greater

12  offense level for RICO is 45.

13         Without even getting into the whole situation with

14  regard to Robert Perez, your adjusted offense level is still

15  at a 45, which puts you in the life range, but the government

16  admits and the Court concludes that your statutory maximum,

17  given the jury's determination, is 20 years.

18         Given that the sentencing guidelines are advisory,

19  the question, Mr. Susinka, is what your sentence would be with

20  a 20-year maximum.  Do you understand that?

21         DEFENDANT SUSINKA:  Yes.

22         THE COURT:  And your criminal history is what it is,

23  which is a Criminal History Category IV.

24         DEFENDANT SUSINKA:  I have some objections to that

25  calculation.

1    THE COURT:  To the criminal history?

2    DEFENDANT SUSINKA:  Yes.  I made them in my PSR -- I

3 mean my memorandum.

4    THE COURT:  In your written submission.

5    DEFENDANT SUSINKA:  Right.

6    THE COURT:  Okay.  And I'm overruling those.

7    So I'm using the calculations made in the PSR.

8    DEFENDANT SUSINKA:  Okay.  So should I move on?  Or

9 you want me to stick with --

10    THE COURT:  No, let's just stop right there.

11    Mr. Wagner, do you have any other legal objections?

12 Because I think -- my problem with Mr. Susinka's presentation

13 is he's getting into sentencing allocution also.

14    Do you want to say anything more about that before we

15 turn it over to Mr. Susinka?

16    MR. WAGNER:  I know Mr. Rimland wanted to address the

17 issue with regard to the consecutive versus concurrent, but

18 not with regards to the Court's position about the 20-year

19 statutory maximum.

20    THE COURT:  Okay.  Well, I'm concluding the 20-year

21 statutory maximum does apply.  I'm going to sit Mr. Susinka

22 down, and we're going to start with the government arguing

23 what it thinks is an appropriate sentence.  Then I'll hear

24 from either of Mr. Susinka's attorneys, and then finally I'll

25 hear from Mr. Susinka again.

1           MR. WAGNER:  All right, sir.  Thank you.

2           MR. POPE:  Thank you, your Honor.

3           THE COURT:  Go ahead.

4           MR. POPE:  Your Honor, if I may --

5           THE COURT:  Yeah.

6           MR. POPE:  -- just one point of clarification.  I

7   understand your rulings regarding adopting the PSR guideline

8   calculations there.

9           THE COURT:  Okay.

10          MR. POPE:  I don't know if I heard this wrong.  I

11  believe you said "without getting into the Robert Perez

12  issues."

13          The issue that I have with that is the guideline

14  begins at 43 because the Probation Office concluded based on

15  evidence that the government submitted that he was involved as

16  a driver in the Robert Perez murder irrespective of the

17  not-proven finding in Phase 2 of the trial.

18          THE COURT:  Right.

19          MR. POPE:  So it is relevant, and I believe you need

20  to make that finding.

21          THE COURT:  To that extent, I did misspeak.

22          Without getting into the RICO Act 3, murder of Robert

23  Perez, technically, but I understand that relevant conduct is

24  what's getting Mr. Susinka into the 45 offense level as a

25  driver.  I understand that.

1          And my conclusion with regard to that, which you can
2     go ahead and argue.  Your argument is that preponderance of
3     the evidence shows that he was the driver, right?
4          MR. POPE:  Certainly preponderance of the evidence
5     and even under clear and convincing if that were ever held to
6     be the standard, under either one of those standards.
7          THE COURT:  Okay.  And I conclude that that is, in
8     fact, the case, based on the evidence at trial.
9          So you can proceed.
10         MR. POPE:  Thank you, Judge.
11         With respect to the 3553(a) factors, I would
12    incorporate my -- the government's sentencing memorandum that
13    was previously filed and submitted to the Court in this case.
14    The -- if I can have one moment, your Honor.
15         THE COURT:  Sure.
16         MR. POPE:  Too many pieces of paper.
17         As we set forth in that, the facts of this case, the
18    nature and circumstances of the case are horrific.  Your Honor
19    sat through the trial, sat through one sentencing already,
20    that I don't think that's in dispute, the history and
21    characteristics of this defendant.
22         As we set forth in our sentencing memorandum, that
23    demands a 20-year sentence in this case consecutive to, which
24    I'll come to in a bit, the time that he's already doing in the
25    state court.

1    This is a defendant who as evidence proved at trial

2  between October 2001 and April 16th, 2002, when he was taken

3  into state custody, he was in Aurora for a little over

4  four-and-a-half months, and in that time period, he was

5  involved in the first incident that he has with the police,

6  he's hooding up.  He's doing what Shorties do.  He's out in

7  the 'hood, hanging out with other Insane Deuce gang members.

8    Second, in November 2002, he's arrested running from

9  Brian Hernandez's house, Brian Hernandez, who was the overseer

10 of the Shorties in 2002 and then also Rafael Vasquez, who was

11 overseeing the Shorties at that time.  He runs with a gun.

12   He then moves -- his mother essentially cuts a deal

13 with the state.  He's going to leave the state.  He leaves, he

14 comes back, we heard the testimony at trial as to why, the

15 circumstances why he came back.  Came back by his own

16 admission on February 1st, 2002.

17   Eleven days later, he is the driver on a murder, the

18 murder of Robert Perez, and it wasn't just I'm in a car.  Some

19 guy hopped out.  I didn't know what was going to happen, you

20 know, and killed somebody.

21   This is the defendant who's with his other gang

22 members driving around in his mother's van, driving around

23 people, hunting for people.  You heard the testimony.  They

24 were hunting, trying to find someone to kill, and they're

25 there multiple -- it takes hours, hours to find somebody.

1          They finally do it.  Harold Crowder gets out of the

2    car, runs to that trailer, murders Robert Perez, runs back to

3    the car, and the defendant drives him away, drives him away.

4    And being Insane Deuces, and they're good at this

5    unfortunately, they call so that they can separate the driver,

6    and Fernando Delatorre is also in the car, from Harold

7    Crowder, the shooter, and the gun.  So they call Orlando

8    Rivera.  They separated and they go their ways, different

9    ways.

10          The next day, the very next day, he's out again doing

11   what Shorties do.  They put out.  They hold down guns.  They

12   commit murders, drive on murders.  They spray paint, too.

13   They're marking their territory.  They not only mark their

14   territory with guns and murder, but they spray paint so that

15   no one, even when you're walking down the street in Aurora

16   when you're not being shot at, you still see the graffiti, the

17   constant fear that they're imposing.  This is our town.  We

18   can take this town.

19          No, they can't.

20          Less than a month -- or eleven days -- ten days

21   later, he's a driver on an attempted murder.  That's

22   February 23rd.  February -- March 13th, he's caught with a gun

23   that's used in a double attempted murder after he comes out of

24   of Brian Hernandez's house.

25          The next day, he and Fernando Delatorre are shot at,

1  rival gang members trying to kill them.  Does he say, well,
2  you know, this is who did it?  No, because that's not his way
3  or the Insane Deuce way.

4        What they do is they shot up, and they handle it
5  themselves.  They take care of business themselves.  And what
6  does that mean?  It means we go out and we kill.

7        April 10th, Shorty meeting.  April 11th, April 15th,
8  he's there, selling drugs, doing the other things that Insane
9  Deuce Shorties do, selling drugs.

10        April 16th, the day he's arrested and he's finally
11 taken off the street, he's wrestling a police officer with a
12 gun.  He was very, very good at his job, and he became a
13 trusted confidante and lieutenant of Fernando Delatorre, who,
14 by anyone's measure, is -- I mean it's staggering the crime
15 wave that he was responsible for as an Insane Deuce gang
16 member.

17        But that's who Fernando Delatorre hung out with,
18 Stephen Susinka.  He was fantastic at his job.  They
19 recognized it, and what's sad about this case, and as I sat
20 here throughout pretrial hearings in this case and today, your
21 Honor, is what's sad about this case is he's a smart kid or a
22 smart man.  He sits there, he's smart.  He's intelligent.  You
23 can tell that from the arguments he made pretrial, the
24 arguments he made today.  He gets it.

25        It's both sad, but at the same time, it's scary

1   because your Honor also knows how this gang works, and this

2   gang works by the smartest, the most organized, the best

3   leaders rising up through the ranks, becoming leaders in this

4   gang.  And prison doesn't stop it.  When he gets out and he

5   gets that perverse respect that prison and doing time on

6   behalf of this organization is going to get him, it wouldn't

7   surprise me in the least if he's a leader, given his

8   intelligence and how good he is at his job, just like Bolivar

9   Benabe when he got out in 1997.

10          His actions, that crime spree that he was on in those

11   four-and-a-half months by any measure is -- shows that he

12   repeatedly demonstrates that he has no respect for human life

13   or the laws that govern normal society.

14          To this day, even standing here today, and this is

15   what surprised me the most about today, standing here today,

16   he still denies everything.  He took that stand during trial,

17   committed perjury, lied through his teeth repeatedly:  No; no;

18   no; I don't recall; I don't know about anything.  He doesn't

19   even -- won't even admit that Fernando Delatorre, the man who

20   wore Insane Deuce on his chest, could not have been prouder of

21   anything else in the world than the fact that he was the

22   leader of the Shorties and an Insane Deuce gang member was an

23   Insane Deuce gang member.

24          He won't admit that his sister was an Insane Deuce

25   gang member.  Brian Hernandez, his mentor within the gang, his

1    sister's boyfriend, wouldn't even admit that, and he's

2    standing here lying about it again today.  It's offensive.  It

3    was offensive when he took the stand at trial, and it's

4    offensive today.

5         The only -- his response repeatedly throughout the

6    trial, and I think I heard some of it today, is the police.

7    Other people are responsible for what I did.  When he was

8    confronted on cross-examination with that October 2001 arrest

9    for hooding up, well, the police actually dragged me down the

10   street and put me with these two other Insane Deuce Shorties.

11        Everything is someone else's fault, mostly

12   overarching police officers.  It's not.  It's the actions,

13   it's the decisions that he made throughout his life, and the

14   decisions he made throughout his life were murder, mayhem,

15   attempted murder and drug trafficking.  That's -- and gun

16   trafficking.  That's what he did.  That's who he is, and it's

17   all his choices.

18        The -- if you strip it down, even if you take,

19   putting aside those ten acts in those four-and-a-half months

20   that he was arrested for, arrested for, not even other things

21   that he did during that time period, one murder, one attempted

22   murder, the only appropriate sentence is 20 years maximum

23   sentence.  The deterrence factors, the messages it sends, all

24   of that is appropriate, and we argue that that should be

25   sentenced -- that should be consecutive to the time he's

1    already done, he's serving right now on his state sentence.

2              THE COURT:  When does the state sentence end?

3              MR. POPE:  I don't -- he is -- he would have been

4    paroled prior to today, no question about that, given the

5    normal rules.  He's remained in custody, but his state

6    sentence was nine years from April 16th of 2002, putting aside

7    any credit that he would have received.  He received a

8    nine-year state sentence on April 16, 2002.

9              THE COURT:  So the consecutive versus concurrent, it

10   sounds to me that we're talking basically a one-year

11   difference?

12             MR. POPE:  No, we are not.  We are talking about if

13   it's concurrent and it goes back to April 16th of 2002 --

14             THE COURT:  Okay.

15             MR. POPE:  -- with the state sentence, then we're

16   talking about a six-and-a-half year -- is that -- roughly

17   six-and-a-half years, six-and-three-quarters years.

18             And the sentence if it's imposed today, the federal

19   sentence can start today; but given his involvement 26-,

20   27-year sentence is functionally what it would be, given his

21   guideline range and given what he did in this case, that's a

22   small price to pay for what he did in this case:  The murder

23   of Robert Perez, the attempted murder on February 23rd at the

24   Porta-Potty, the guns, the drugs, everything that he did and

25   who he was.  It's a small price to pay.

1        There is no question and there is no dispute, your
2   Honor, it is within your discretion.  I went through in our
3   sentencing memorandum and I went through the guidelines
4   analysis.  I believe that it is -- under the guidelines, it
5   falls in the category where it says it shall be consecutive.
6   I believe that's an act based on the analysis and the drug
7   conviction for which he's doing time and the gun conviction
8   for which he's doing time are under 2E1.1, the RICO guideline,
9   and the application notes to that are not considered relevant
10  conduct.  They are not considered -- they're considered
11  criminal history points instead.  It falls in that.

12        But regardless, the guidelines, as we all know, are
13  advisory.  It's fully within your discretion; but, again, it
14  is a small, small price to pay for what he did for all the
15  reasons that we submitted in the post-trial -- at trial, in
16  the post-trial briefing, and in our government's version.

17        He needs to be taken off the street so that the
18  people of Aurora can be safer for as long as possible, and
19  make no mistake about it.  Every day that Stephen Susinka
20  spends in jail the people of Aurora, the children of Aurora,
21  are safer.

22        THE COURT:  Mr. Rimland or Mr. Wagner.

23        MR. RIMLAND:  Your Honor, if I can just quickly
24  address the issue of --

25        THE COURT:  Sure.

1      MR. RIMLAND:  -- concurrent versus consecutive.

2      THE COURT:  Okay.

3      MR. RIMLAND:  Thank you.

4      I disagree with Mr. Pope with respect to the

5  mandatory nature under the guidelines with regard to 5G1.3(a)

6  if the Court were to find it acceptable under (a) or

7  applicable under (a).

8      First we cited the case to the Court, which is *U.S.*

9  *versus Schaefer*, I believe, a 7th Circuit case, indicating very

10  clearly -- *U.S. versus Schaefer*, indicating very clearly that

11  it's not mandatory, but it's discretionary.

12      Then looking at the question of whether or not the

13  offenses for which he was sentenced in the state court, it is

14  my humble opinion that those matters were relevant conduct in

15  this case and is provided for in 5G1.3(b), that those two

16  offenses would be considered relevant conduct and that by

17  virtue of 5G1.3(b), that it would be required under that

18  guideline, the same as Mr. Pope has indicated under (a), that

19  it would be required that he be sentenced to a concurrent

20  sentence.

21      Most respectfully, what I'm suggesting to the Court

22  is absolutely discretionary based upon the case law, based

23  upon the circumstances of the events that led to the state

24  court convictions, I believe are part and parcel of what the

25  government had to prove in this case in order for purposes of

1   establishing their proof beyond a reasonable doubt that

2   Susinka was guilty of the RICO conspiracy.

3        And I most respectfully also suggest, your Honor,

4   that he was in prison at the time, and I'm just responding to

5   the written argument of the government, that he was in prison

6   at the time of the balance of the conspiracy.  Therefore, he

7   should not be held responsible for it because of the

8   withdrawal from the conspiracy.  That's what I wish to add to

9   this Court.

10       THE COURT:  Thank you, Mr. Rimland.

11       Should we go back to then Mr. Susinka, or do you want

12   to add anything, Mr. Wagner?

13       MR. WAGNER:  Only if the Court would allow me.  Today

14   when we arrived, Stephen's parents are both here, Judge.

15   Mrs. Susinka actually had handed me a letter by way of

16   mitigation from a parent to the Court --

17       THE COURT:  Okay.

18       MR. WAGNER:  -- and had asked me, with the Court's

19   permission, if I were allowed to read it into the record.

20       THE COURT:  Sure, you can read it into the record.

21       MR. WAGNER:  Thank you, Judge.

22       THE COURT:  And I have read your previous written

23   submission --

24       MR. WAGNER:  Thank you, your Honor.

25       THE COURT:  -- along with the exhibits, but go ahead.

1    MR. RIMLAND:  Excuse me.  I'm sorry, your Honor, may
2  I quickly interrupt something that popped into my head that I
3  forgot.

4    I wish also to state that if this Court were to
5  consider not imposing a sentence, a concurrent sentence with
6  the state court sentences that Mr. Susinka is presently
7  serving, that at least the Court consider giving him credit
8  for the time he's been in federal custody.  I think that that
9  would be an appropriate matter for this Court.

10    Thank you.

11    THE COURT:  Okay.

12    MR. WAGNER:  It's dated January 19, 2009, and it
13  states:

14    Your Honor:  My name is Theresa Susinka, and on
15  Tuesday, January 20, 2009, you'll be sentencing my son,
16  Stephen Susinka.  As a parent, I appeal to you for your
17  leniency with respect to Stevie's sentence.  You see, your
18  Honor, Stephen will always be Stevie to his family.  Since the
19  age of 18 years old and for the last seven years, Stephen has
20  been paying the price for the mistakes of his youth.

21    As a parent, one takes pride in their child's
22  achievements and accomplishments and anguish over their
23  mistakes; but no matter what the child has done, they are
24  still your child, and you love them -- and your love for them
25  never diminishes.  Stevie has made mistakes, and he has taken

1 | responsibility for them and has deep regret for each action
2 | that brought him to the place he is today.

3 |      Over the last seven years, he has made the best out
4 | of a bad situation. Instead of feeling sorry for himself and
5 | becoming a problem inmate, he has worked toward and achieved
6 | his G.E.D. At his previous facility, he took college courses,
7 | which are unfortunately not available at the facility he's
8 | currently at. He has been active in his own defense, writing
9 | many motions and appeals and helped other inmates writing
10 | theirs as well. He's taught himself these skills by learning
11 | and studying the law as it applies to each individual
12 | situation.

13 |      People who do not know Steve have been amazed at the
14 | level of professionalism with which he conducts himself.
15 | During the past seven years, he's also learned to cut hair,
16 | and works in that capacity.

17 |      Above all, and through all of the ups and downs of
18 | the past seven years, his biggest concern has always been his
19 | family. No matter what he has endured personally over time,
20 | he has always told us, especially me, that he's okay, that I
21 | should not worry; but as a parent, how can I not?

22 |      I've seen my son be moved from facility to facility
23 | over the years, have had long periods of time where I could
24 | not see him, yet he never failed to make weekly calls and sent
25 | letters to us that we knew he was okay.

1    Has my son made mistakes?  Yes, he has, and not only
2  has he taken responsibility, but he's also shown remorse for
3  them.  When he was initially arrested he was a young kid who
4  got himself involved with the wrong people.
5    I only ask you to give due consideration to his time
6  served, and as a parent, I ask for leniency when you pass
7  sentence on him.  My wish for my son is to be paroled for time
8  served so that he can take the skills that he's learned and go
9  on to be a productive member of society.
10    As you can surely understand if you are a parent, all
11  I want for my son is happiness in his life and a safe and
12  productive future for him and hopefully for him to some day be
13  able to start a family of his own.
14    So, your Honor, I thank you for your time that you
15  have given to read this letter, and I appreciate all due
16  consideration that you may give to my son.  As a parent, it
17  would give me no greater joy than to have my son come home
18  after all these years and start his life fresh.  With your
19  help, he may be able to do just that.
20    With deepest sincerity, and it's signed Theresa
21  Susinka.
22    Thank you, Judge.  If I can just add a couple of
23  personal comments.
24    THE COURT:  Sure.
25    MR. WAGNER:  Your Honor, I've been a lawyer, in April

1    it will be 30 years, and from time to time both in state and
2    federal court, I've had the opportunity to represent numerous
3    people who have endeavored to take on their own cause by
4    writing motions, representing themselves and doing whatever.
5    And I find, as the government has indicated and I know your
6    Honor has taken note of, that Steve has some exceptional
7    talent.  I was first taken by it when he considered actually
8    representing himself and there was a give-and-take between you
9    and Stephen with regards to his ability to actually conduct
10   himself in court, and I was most impressed.

11          And at that point, I was convinced that your Honor
12   was actually leaning towards allowing him to represent
13   himself.

14          But I'm glad that he chose then to withdraw his
15   request and allow Mr. Rimland and I to continue to represent
16   him during the course of the trial; but I was impressed by his
17   ability not only to get up and speak but in the written
18   motions that he's presented, but most importantly by his
19   ability to conduct himself with grace under pressure, and
20   certainly giving all the due respect that he could both to the
21   Court and to the government.

22          His rehabilitative potential to me is enormous.  So I
23   say that just as a personal reflection as being his lawyer for
24   the last few years, and, again, can only add my sentiments to
25   his mom that the Court give all that due consideration.

1          Thank you, Judge.

2          THE COURT:  You're welcome.

3          Mr. Susinka, is there anything else you want to add

4  before I sentence you?

5          DEFENDANT SUSINKA:  Yes.  Can I blow my nose first?

6          THE COURT:  You can stand up.

7          DEFENDANT SUSINKA:  Can I grab some Kleenex and blow

8  my nose?

9          THE COURT:  Sure.

10          THE CLERK:  I've got some right here.

11    (Pause.)

12          DEFENDANT SUSINKA:  I don't know, I still got some

13  legal arguments I guess I need to add.  I mean if you want to

14  make this part of my allocution.

15          THE COURT:  If they relate to sentencing, you're free

16  to make them.

17          DEFENDANT SUSINKA:  Okay.  Just I'm not even going to

18  go over the argument, I'm just going to let you know that I

19  feel like I -- I mean I qualify for mitigating role reduction

20  and a reduction, I guess, in the guideline 5K2.0.  I think

21  it's under the *Rita* case that says that the guidelines, if the

22  guidelines fall off of the heartland of the usual case that

23  the guidelines apply to, I'm saying that the heartland of

24  cases that the guidelines are meant to apply to are cases that

25  people were actually found guilty of.

1          I object to the obstruction-of-justice enhancement,

2   the two points.

3          THE COURT:  You realize it hasn't even been used.

4          DEFENDANT SUSINKA:  You calculated my offense level

5   to 45 based on the PSR.

6          THE COURT:  Right.

7          DEFENDANT SUSINKA:  That's with the two points.

8          MR. POPE:  Which applied the obstruction of justice.

9          THE COURT:  Which applied, okay.  So you're objecting

10  to that.  Your version is that you did not obstruct justice in

11  your testimony at trial.

12         DEFENDANT SUSINKA:  Yes.  I got a case.  For the

13  record, *United States versus Thundershield* from the 8th Circuit

14  decided January 28, 2007.  They tried to enhance the sentence

15  for testifying at trial.  They said that it's not perjury, and

16  I quote, "simply because a defendant testifies on his own

17  behalf and the jury disbelieves him."  That's directly from

18  the case.

19         Then, I guess --

20         THE COURT:  So your position at trial and here and

21  now, just so I understand this, is that you at that point were

22  charged offenses and at trial and here and now are not an

23  Insane Deuce.

24         DEFENDANT SUSINKA:  I wish not to respond to that.

25         THE COURT:  That's probably smart, but I will tell

1   you it's my conclusion, so that the record is complete, that

2   you lied numerous times during the trial.  So I have no

3   hesitation using the obstruction-of-justice enhancement.

4        So if I were you, I'd move on it to some other

5   argument.

6        DEFENDANT SUSINKA:  Okay.  I just wanted to make my

7   record.

8        I guess I got the what's called the parsimony

9   provision of the guidelines.  There's a case from the 4th

10  Circuit, *United States versus Ibanga*, I-B-A-N-G-A.  It was a

11  sentencing memorandum written by the judge that claimed that

12  under 3553(a)(2)(a) that sentencing a defendant for acquitted

13  conduct -- I guess I'm stuck on the acquitted-conduct issue --

14  but it wouldn't promote respect for the law because I guess

15  being born and bred in the United States, you're raised with

16  the belief that you have a right to trial and that you'll only

17  be sentenced for issues that were -- basically you were found

18  guilty for at trial.  And I was only found guilty of

19  conspiracy, which the focus of the conspiracy is the

20  agreement.

21       The seriousness of the offense, I say the jury's

22  verdict speaks for itself.  They let me off for the Perez

23  incident.  They didn't make a ruling for the drug conspiracy.

24  I wasn't part of any drug conspiracy with any Insane Deuces.

25  So the offense, my offense involves only carrying a gun,

1    according to my version, carrying one gun.  I sold some drugs

2    on my own.  I didn't pay any dues, and I was, according to my

3    version, an accessory after the fact on attempted murder.

4         So the seriousness, it can be held as serious, but at

5    the same time, you know what I'm saying.  I don't know.  I

6    been shot before.  I been shot at numerous times.  Supposedly,

7    you know what I'm saying, whatever was going on out there,

8    whatever I been through it, so maybe I might be desensitized

9    to what it is, as to the seriousness of shootings and all that

10   type of deal, whatever, guns and drugs.

11        They talk about just punishment.  I feel like I've

12   already been jailed for a long time.  It's been seven years.

13   Almost seven years, six years and nine months.  I was young.

14   I mean the Supreme Court says that age is a considerable

15   factor.  So, I mean, my age comes into play.  I might get to

16   that in a second.

17        Another part of 3553 is the deterrent effect.  I mean

18   I don't know how -- the government is pushing for a 20-year

19   sentence, claiming that it's going to send a message to the

20   street.  I mean the only message I see it sending is that you

21   go to trial for nothing.  I mean you go to trial to get

22   certain factual issues determined and once they get

23   determined, they get ignored.  So there's no deterrent effect

24   to that in my eyes.  But, whatever, you know what I'm saying?

25   Whatever is going to happen is going to happen today.

1       Incapacitation, I mean I've already been

2   incapacitated for seven years.  I committed my crime, I

3   accepted my responsibility back then.  I mean there's nothing

4   to worry about coming from me.  I wasn't a full-fledged,

5   hard-core gangbanger.  I mean you believe what you believe.

6   You believe I'm an Insane Deuce.

7           MR. RIMLAND:  Excuse me one second, your Honor.

8           THE COURT:  That's okay.

9     (Counsel and defendant confer.)

10          DEFENDANT SUSINKA:  I mean, I just feel like I'm --

11          MR. RIMLAND:  Thank you, your Honor.

12          DEFENDANT SUSINKA:  But, I mean, I just -- I been

13  incapacitated for seven years already.  And I feel like if I

14  were to go home any time before 20 years, I think it makes no

15  difference because my mind is already made up about what I'm

16  going to do when I get out, so --

17          THE COURT:  What are you going to do?

18          DEFENDANT SUSINKA:  I feel like I'm going to go home

19  and conduct myself like I'm supposed to, like an adult, like a

20  man.  Find a better way to make a living for myself and avoid

21  all the B.S.  So I don't know.  I been through enough already.

22  So I mean that's just how I feel, but I feel like I've been

23  incapacitated long enough.

24          I'd even say that incapacitation doesn't even come

25  into play anymore because me being in jail isn't what would be

1   keeping me from committing further crimes, so whether I was in
2   jail or out on the street, I wouldn't be committing any
3   crimes.
4          Rehabilitation, the parsimony provision, I mean I
5   guess I've been rehabilitated.  I mean I still have the same
6   mentality.  It's just I made some bad choice, I made the wrong
7   choices.  I got -- I guess now I go into, like, my allocution,
8   I guess.
9          As I wrote in my memorandum, I wasn't a bred
10  criminal.  I feel like I pretty much had a normal upbringing.
11  I wasn't raised in a household full of guns and drugs and
12  gangbangers and stuff like that.  So that's not what my
13  parents raised me to be; but, you know, I was raised in a bad
14  neighborhood, so I was exposed to a lot more negative than
15  positive, you know, when I grew up.
16         And watching my mother and my father, they worked day
17  to day, you know, like struggling, living paycheck to
18  paycheck.  I guess, to me, that wasn't an appealing lifestyle;
19  and when I was young, I wanted money at a young age, so I
20  started doing what I did to make money.
21         But I still feel like I wasn't a bred criminal.  It's
22  just a choice because I see some people, I hear their stories
23  about how they ended up in jail and how they were brought up
24  in Chicago and this and that, and my story doesn't even amount
25  to a quarter of, half of the drama they've been through to

1    make them do what they did and become incarcerated.

2         But because, like, I'm not one of those bred

3    criminals and it's not like my only way of life and because

4    the way I was raised, I feel like that would be like a proper

5    mitigating factor.

6         Another one is that because I was shot, you know, I

7    was like -- I just turned 17 when I was shot.  I didn't know

8    how to react to that.  You know, I'm young.  There's a lot of

9    things going on.

10        You know, people shoot at me, they shoot me.  I don't

11   know how to react to that, so, I mean, I feel like I had to

12   pick up a gun to protect myself.  Even though I might not have

13   been out there running around, like, gangbanging, shooting

14   people, but I was ready if they came to me to defend myself.

15        Then there was rumors, takeover of my neighborhood

16   where I live right there, back then.  Prior to my 18th

17   birthday, they thought I was a Deuce, all right, 'cause I hung

18   around.  So they're shooting at me.  They're coming at me

19   everywhere I'm going.

20        So, whatever, because they want to take over my

21   neighborhood.  They either want me dead or gone, and I can't

22   move anywhere.  I don't have any money, and that was around

23   the same time I ended up leaving for California.

24        My mom came to me.  She was, like, basically begging

25   me to leave because she was worried about what was going on,

 1    and I could have stayed.  It doesn't matter.  He claims it was

 2    part of negotiations.  Oh, my mom did this and that to

 3    negotiate a deal.

 4         I know what I testified to, but I guess now that I

 5    recollect, I don't think it was part of a negotiation.  I

 6    think she maybe went and asked for permission, but it wasn't a

 7    negotiation that, oh, we'll drop this if you leave because

 8    this was all my mother's idea, not the prosecution's idea,

 9    because she wanted me to leave.

10         So I could have stayed because like I wrote in my

11    memorandum, why worry about being locked up for a petty

12    probation violation.  What are they going to lock me up for,

13    30 days when I'm out there carrying a gun and selling drugs?

14    That obviously got me nine years in prison, or, well, a

15    nine-year sentence, and it's still been lasting on going now

16    for almost seven years.

17         So upon my own initiative but my mother's

18    encouragement, I left voluntarily to California.  I left -- I

19    just turned 18, so I was, like, all right, leave it all

20    behind.  That's not doing me any good anyway.  So on my own, I

21    turned and I left.

22         But when I got there, things weren't going as

23    planned, and I seen something.  I made an accusation that my

24    grandfather was raping my cousin, okay?  So I make the

25    accusation because even though I didn't know them that well, I

1    wasn't raised with them as family, they were blood.  So I felt
2    like since I was -- since they were blood, that I would bring
3    it to somebody's attention.

4          So once I make the accusation, there's a big
5    argument, a fight breaks out, and they kick me out.  So I
6    leave, and I come back.

7          I mean up until that point, yeah, it's my fault
8    because I made the accusation; but I believed I was doing what
9    I thought was right.  I mean stuff like that going on, I mean
10   I don't believe in that type of thing, and I don't like that.

11         So I just brought it to everybody's attention.  They
12   chose to side with my grandfather by marriage.  And so they
13   booted me out, and I had to come back.

14         I thought about staying.  I was going to stay because
15   I still had some money in my pocket, but at the time there was
16   so much going on in my mind, I was just -- I wanted to get
17   back to what I knew, what I knew was familiar.  So I went
18   home.

19         Then like I wrote in my memorandum, I stopped in Las
20   Vegas.  I thought about staying there, but then -- 'cause I
21   was so focused on just getting out of there and going home, I
22   just ended up going all the way home.

23         Then once I get home, after everything is all said
24   and done, I end up in jail.  I end up finding out that the
25   same accusation that I made to my grandfather was made towards

1  him at least on two other occasions, my grandfather by

2  marriage.

3         So, I mean, I was right in doing what I did, in

4  trying to stop what was going on.  So supposedly after I made

5  that accusation, my cousin, they ended up moving away from my

6  grandfather.  I don't know.  All I'm saying is the point of

7  that is that I left, and that shows that that wasn't my intent

8  to be out there leading a life of crime.  I voluntarily left,

9  and I stopped doing everything.  I left everything.  I left my

10 cell phone.  I didn't take anything.  I just took some money

11 and my clothes.  I went out there and bought everything brand

12 new.

13        I was looking for a job, and I signed up for school

14 because I was trying to finish my high school education and

15 get my diploma and then make up my mind what I want to do next

16 once I reached that level and get my diploma.  But everything

17 got blown out of the water.  I had no control over it, I

18 guess, because the way everybody reacted to it -- the way I

19 imagined everybody reacting to it wasn't the way everything

20 that unfolded.

21        Then when I came back from California, my mentality,

22 like, I was so messed up, like, I was still young, I think,

23 you know, I had just turned 18, and I was mad because I left

24 on my own and I tried to do something better with myself, and

25 it just didn't work out.

1    So I felt like -- like it was failed.  When I tried

2    to do something right, it failed; but when I'm doing things

3    that are wrong, it seemed to be working out.  I'm selling

4    drugs, I'm making money.  So it's like, phew, so in my eyes,

5    like, that's going favorable to me.  But when I try to go to

6    school and get a job, I can't find a job.  And I finally sign

7    up for school and I end up getting kicked out, you know, from

8    my grandmother's house, so I got nowhere to stay, so I gotta

9    come back home.  So my mentality was, like, I pretty much gave

10   up, I gave up on myself, and I shouldn't have done that, but I

11   did, you know.

12   I mean that's just pretty much what happened, you

13   know what I mean?  I didn't come back, I didn't mean to start

14   hanging around and doing this and whatever you feel I'm

15   responsible for; but that was just my mentality, man.  I was

16   lost.  I was young, and I was lost.  I feel like I was trying

17   to be something I'm not.  I lost myself, forgot who I was, and

18   turned to the -- turned to the wrong direction.

19   But past that, I got my own self-rehabilitation

20   efforts.  Before the indictment in this case, I got my G.E.D.

21   on my own.  Nobody pushed me.  I see people cooperating with

22   the government.  They're pushing them, putting them in school,

23   and they're still not even achieving, getting their G.E.D. or

24   no high school diploma.  They're still sitting up there

25   smoking weed, living at their mom's house.  But that's how I

1   done.  And that's with people pushing them to do that, and
2   they're still not even doing it.  But on my own, I took it
3   upon myself because that's my mentality was to try to better
4   myself.  Because it's a dead-end.  I see where it's going.
5   There's no getting away with this.

6            So I took it upon myself.  I seen the education.
7   That was my goal from the beginning, but it failed in
8   California.  So I got another chance to get my education, so I
9   go and I get my G.E.D. right away.  That's the first thing I
10  did when I got to IDOC.  I signed up for school.  They put me
11  in G.E.D. class.  I pass it, get my G.E.D.

12           Soon as I get done with my G.E.D., I want to advance
13  my education.  They're offering college courses, so I take
14  college courses.  I purposely stopped taking the college
15  courses because I was getting ready to go home, and I wanted
16  to leave that unfinished, so once I get home, I finish that up
17  on the street in a real either university or like a local
18  college or something like that, just to finish getting my
19  associate's.

20           At least I would get some type of education that
21  would help me with better finding a job.  But these are my own
22  self-rehabilitation efforts before this indictment.  It's not
23  an attempt to build a mitigation case.  It's not like I caught
24  this indictment, then I started taking all these classes and
25  going to church and turn religious just because I caught this

1   case, now I'm trying to earn a lower sentence.  This was

2   before this case happened, before the government became

3   involved, and it was just me on my own doing my time, focusing

4   on going home, but trying to prepare myself to get to the

5   street and be prepared to face the world as a man.

6          I picked up a couple skills while in jail.  I became

7   a barber, just picked up the clippers, started cutting hair.

8   So that could help me if or whenever I get released.  You

9   know, I can go home.  I can cut hair, try to open a barber

10  shop or something.  I don't know.  Maybe improve the economy,

11  since if I own a barber shop, I'll be offering jobs so there

12  will be open jobs, I guess.

13         I kind of became like somewhat of a jailhouse lawyer

14  or paralegal, whatever.  I gave that consideration, like

15  whenever I were to go home, I could go finish, get a paralegal

16  degree because I think I'm pretty good at that, the way I

17  write at least.  I don't know about my oral presentation, but

18  the way I write I think is good enough to qualify as a

19  paralegal.  All I got to do is get the education.

20         Then I guess my last one was the age, or one of my

21  last ones was the age, past and present.  My age back then.

22  Like the *Gall* case, they cite *Roper versus Simmons*, but the

23  *Gall* case quotes saying "that a lack of maturity and an

24  undeveloped sense of responsibility are qualities that often

25  result in impetuous and ill considered actions."

1       So even though my age might not, like, be a total
2   excuse for my immaturity, it comes into play, you know what I
3   mean?  I mean add on to, like, the situation with California,
4   people shooting at me, there's just so much going on, like, I
5   don't know how to react.  I only seen one way to react, and
6   that was to try to protect myself.
7       But I think my age should be taken into
8   consideration, my past age, because all this case is built on
9   I was 18 years old.  I had just turned 18, and I was only out
10  there for two months in Aurora at the age of 18.  The
11  government cites four months.
12      When I was 18 years old, I was out there for two
13  months, two-and-a-half months.  I came back February 1st to
14  April 16th, 2002.  I was 18, a fresh 18.
15      My last one is I think I have a strong potential for
16  rehabilitation.  I made up my mind, you know, a long time ago
17  before any of this even happened, and that's why it kind of
18  blindsided me.  I haven't been around anybody, like, from my
19  neighborhood the whole time I was locked up.  I rotated -- I
20  mean, I got around on my own.  I didn't mess with anybody, any
21  of the gangbangers, no nothing like that.  I distanced myself
22  from that.  People I knew from the streets, I distanced myself
23  from them, like -- but the gangbangers, anybody I knew from
24  the streets, that's who I wasn't around, but there were other
25  people I bumped into that I knew, like, from the area, but

1    they weren't Deuces, now, but I still pushed myself away.  I
2    didn't want anything to do with Aurora.

3          You have your own opinion regarding my intelligence
4    and my ability to rehabilitate myself or what you think I'm
5    going to go home and do.  The government thinks I'm going to
6    go home and try to gangbang.  Why would I do something as
7    stupid as that when, from what I see, just apparently being in
8    a gang is what's going to end me back right here where I'm
9    sitting right now in the same type of situation that I don't
10   want to be in.  I'd rather be on the streets fulfilling my
11   life.

12         Like today, I was talking to a 58-year-old man, and
13   he was telling me that there's still a lot of things in life
14   that he wants to experience, and he's 58 years old.  I'm 25.
15   So I'm sitting there thinking, like, man, how much could you
16   have done so far in your life to where you've reached 58 years
17   old and you still want to do more.

18         So I'm thinking all the things I sit here and I think
19   about I want to do.  By the time I reach 58, I'm not going to
20   experience a lot of the things that I think I'm going to be
21   able to experience between now and then, so -- so by me being
22   in jail, you know what I'm saying, it's cutting me off, you
23   know what I'm saying.  It's just helping me, like -- like, I
24   don't know, like, I just don't want to be sitting in jail,
25   know what I'm saying, like, wishing this and wishing that,

1     should've, would've, could've, but maybe it's too late for
2     that.

3           But I don't know.  I think that's pretty much it.  I
4     mean I don't see myself, like, on a life sentence installment
5     plan.  I've seen the guys in the joint.  It's like their
6     fourth time in the joint.  They're, like, 45 years old, been
7     in and out, in and out, in and out.  That's not me.  I'm not
8     the type of person to keep banging my head against the wall.

9           You've got your own opinion, like I said, of my
10    intelligence.  You think I'm the type of person to do that or
11    not, it's your ruling, your opinion.

12          So then I guess I'll finish off from the *White* case,
13    it's the most recent case.  It just talks about, it's like one
14    of the essential points -- this is a quote from the case:
15    "One of the essential points of *Booker*, which was highlighted
16    by *Kimbrough versus United States*, is that a district court
17    judge may disagree with the application of the guidelines to a
18    particular defendant because the guidelines range is too high
19    or too low to accomplish the purposes set forth in 3553(a).
20    If the district court concludes that the sentence produced in
21    part by these relevant conduct enhancements fails to properly
22    reflect 3553(a) considerations," they cite *Rita,* "the judge
23    may impose a lower sentence, including, if reasonable, a lower
24    sentence that effectively negates the acquitted conduct
25    enhancement."

1       It says, "A district court that enhances a sentence
2   based on acquitted conduct in fulfilling his duty to
3   adequately explain the chosen sentence to promote the
4   perception of fair sentencing should articulate how and why in
5   his judgment such conduct appropriately influenced his 3553(a)
6   analysis with respect to the specific defendant and the
7   specific crime at issue."

8       I'm leaning towards the Perez incident, so even
9   though you calculated my guidelines at a level 43, case law
10  claims that you can disregard the guidelines and still give me
11  whatever sentence you think is sufficient but not greater than
12  necessary under 3553(a).

13      And considering that I've been gone a long time,
14  considering that I have no plans on even going back to Aurora.
15  As a matter of fact, I had a lot of hope, you know, like when
16  I came in here about, like, certain findings you would make.
17  I'm always confident in the things I do, so I looked up on the
18  bright side, you know, hoping everything will go my way.  But
19  'cause, you know, in my memorandum, I asked for time served
20  because -- but that was pretty much based on my calculation of
21  the guidelines, and the time I have in is like 81 months, so
22  it fulfills, like, assuming I would catch my good time, like a
23  95-month sentence.

24      So, like I say, if you were to give me ten years, it
25  would be, like, to account for my time in the state, it would

1   be like a 25-month sentence, 26-month sentence, and I'd be out

2   like in, I don't know, like two years, two-and-a-half years,

3   before I'm 30.

4             THE COURT:  I think you need to stop, Mr. Susinka.

5             DEFENDANT SUSINKA:  Think so?  All right.  Well, I

6   was just going to say one more thing, please.

7             If -- I doubt it, but I'm going to say it anyways --

8   if you choose to release me, say you give me time considered

9   today, right, as a sufficient -- if you look at me right now

10  and you seriously think that I'm going to go home and try to

11  gangbang, right, so that would be your basic reason because

12  you would think that I'm not rehabilitated or you think I'm

13  some career criminal or whatever you might think, I don't

14  know.

15            But, say, if you do think that I was rehabilitated

16  and that I have a strong potential to go home and make a man

17  of myself in a legitimate way, that if you were going to

18  release me, like, not to release me to the street but

19  discharge me to a halfway house or that once I get discharged

20  from my state, discharge me to a halfway house so that at

21  least I can be in a halfway house.  I'll get on my feet from

22  the halfway house.  Then I can take the money, I mean I'll

23  probably still be in this district, but I won't be in Aurora.

24  So I could find me somewhere to live, organize my life and

25  everything while sitting at the halfway house.

1    But that was if you choose to discharge me.  But
2  that's it.  But I think that 20 years is way more than
3  sufficient to serve the purposes of sentencing on 3553(a),
4  which is more relevant than the guidelines.

5    I guess that's it.  That concludes my allocution.
6  Thank you.

7    THE COURT:  You're welcome.

8    DEFENDANT SUSINKA:  Oh, excuse me, excuse me, excuse
9  me.  I forgot.

10    I want to apologize to my family.  I forgot.  I know,
11  like, they see me like they raised me, so they probably had,
12  like, high hopes about what I could become, and I failed.  So
13  I apologize.

14    I apologize to my mother for stressing her out,
15  apologize to my father for stressing, for making -- for making
16  them stressed, and then I apologize to myself because I failed
17  myself.  I lost myself and my sense of self, but -- and then
18  thank you, I mean, for letting me speak.  I appreciate it now
19  and in the past.  That's it.

20    Thank you.

21    THE COURT:  Well, Mr. Susinka, it pains me to
22  sentence you, but I need to do what I need to do.  And it
23  pains me because you are bright.  You have a lot of potential,
24  and I just wonder about you.  Ultimately, I wonder what it is
25  that you learned during this trial.

1    I mean I hope that you learned a great deal by

2    sitting through the trial. I hope somewhere in there that you

3    learned that you were used in this case, and you were used by

4    being asked to be a member of a gang, by agreeing to be a

5    member of a gang, by going on missions as you did in this

6    case.

7        There's no doubt in my mind that you drove your

8    mother's van and that you drove Mr. Crowder to a site and that

9    you knew he was likely to shoot somebody, and you knew what

10   that was all about because on the one hand, you can't be as

11   bright as you are here and make the arguments you are and yet

12   somehow claim that out on the streets, you were just this dumb

13   guy who managed to get different cars and managed to be in the

14   wrong places at the wrong time too often with loaded weapons

15   on you, way too often.

16       I think you need to, in the first instance, look in

17   the mirror, accept responsibility for all that you've done,

18   which I'm not sure that you have. You're so clever that I

19   think you fool yourself sometimes into blaming your

20   environment.

21       There's a lot of people that have grown up poor.

22   There's a lot of people that don't like the whole thing of

23   working and getting a paycheck every week, as you admitted

24   even here today you looked down your nose at.

25       Those are good people, hard working people, people

1   like your parents who you've clearly frustrated.  Stressed out
2   is a light word.  They tried to do their best for you.   You
3   definitely let them down, let yourself down.

4           But what is troublesome to me is that I conclude that
5   while there's no evidence that you pulled the trigger, you
6   certainly put other people in a position to kill other
7   individuals.  So what do we say to somebody like Steven Perez
8   who is shot and dead?  What do we say to David Morales?  What
9   do we say to Mr. Lazcano, who was the wrong person killed?
10  What do we say to Mr. Urbell Valdez?

11          Or do you not care about that?  Because if you don't
12  care about that, then you're going to learn nothing.  And that
13  would worry me if you've learned nothing after all of this.

14          As a result of an election, our country's made a
15  choice today.  A new president has been sworn in.  I bring
16  this up because today you have to make a choice.  Are you
17  going to accept the sentence that I'm going to impose and then
18  go back as a man of your word and go back, rehabilitate
19  yourself through the federal prison system.

20          I think the idea that you could sit through the same
21  trial that I did and somehow think that you're either going to
22  get time served or be out before your 30th birthday is an idea
23  that is fanciful and wishful thinking.  There's no way that
24  you could be part of the Insane Deuces, as I conclude that you
25  were, and not get a 20-year sentence because the sentencing

1    guideline range is life.  The statutory max is 20 years.

2         I will sentence you to 20 years in the custody of the

3    Attorney General, which I think is the only fair sentence that

4    will not deprecate the fact that certain individuals are in

5    wheelchairs, shot up or dead as a result of your gang

6    activity.

7         Where I will use my discretion to your benefit is I

8    will make this sentence concurrent with the state sentence,

9    which is to your great benefit, which is something the

10   government doesn't want me to do.

11        I do that because I do think your rehabilitation

12   potential, if I take you at your word, is great.  I do think

13   that you made some efforts prior to this federal indictment to

14   change your life around, but you need to desperately make this

15   your last conviction.

16        If you don't, it is my prediction, Mr. Susinka, that

17   the next sentence that you receive either in the state system

18   or in the federal system will be the last sentence that you

19   receive because it will be like the sentence that I just

20   imposed on Mr. Benabe, which will be a life sentence.  Or, to

21   the contrary, the next time that you are shot, Mr. Susinka, it

22   will be the end of your life.

23        So you need to make that decision over the next few

24   years; but for today, I will sentence you to 20 years in the

25   custody of the Bureau of Prisons, put you on five years of my

1  supervised release, use my discretion to make your sentence to
2  be served concurrent with your current state sentence.
3        I'm going to impose a fine of $2,500 which will be
4  paid from funds that you will generate by working in prison,
5  and assess you $100.
6        You have a right to appeal both the sentence and
7  conviction by filing a notice of appeal within ten days.  If
8  you need court-appointed counsel, you can request one from the
9  Court of Appeals.
10        Mr. Rimland or Mr. Wagner, do you want me to
11  recommend any particular facility?
12        MR. RIMLAND:  In terms of a particular institution,
13  your Honor, no; but in terms of someplace that would be
14  conveniently located so that his family can visit with him
15  would be great.
16        THE COURT:  Okay.  I will recommend the most
17  appropriate facility be designated closest to the Chicago
18  metropolitan area.
19        Is there anything else we need to cover on behalf of
20  the government?
21        MR. POPE:  Yes, your Honor.
22        At this point we'd move to dismiss Count 9 of the
23  indictment as to this defendant.
24        THE COURT:  Count 9 will be dismissed with prejudice.
25        Anything else on behalf of the defense?

1    MR. RIMLAND:  Not at this time.

2    MR. WAGNER:  No, sir.

3    THE COURT:  Good luck to you, Mr. Susinka.

4    MR. WAGNER:  Thank you.

5    THE COURT:  We'll stand in recess.

6    (Which were all the proceedings heard.)

7                        CERTIFICATE

8    I certify that the foregoing is a correct transcript from

9    the record of proceedings in the above-entitled matter.

10   */s/Kathleen M. Fennell*              *March 2, 2009*

11   _____        _____

12   Kathleen M. Fennell                  Date
     Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25